# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF NORTH CAROLINA
# STATESVILLE DIVISION
# CASE NO. 5:14-CR-56

| UNITED STATES, | ) |  |
|---|---|---|
|  | ) |  |
| v. | ) | **ORDER** |
|  | ) |  |
| MARK WESLEY MOORE, | ) |  |

**BEFORE THE COURT** is a Motion to Suppress Tangible Evidence and Statements filed by Defendant. (Doc. 12). The Government filed a Response (Doc. 13), to which the Defendant replied (Doc. 14).

The Court held an evidentiary hearing on the Motion to Suppress on December 4, 2014, and the motion is now ripe for disposition. Having fully considered the arguments, evidence, and legal authorities, the Court will **DENY** the Defendant's Motion to Suppress.

## I. BACKGROUND AND FACTUAL FINDINGS

On September 17, 2014, an Indictment was returned alleging that Defendant violated 18 U.S.C. § 922(g)(1) and 26 U.S.C. § 5861 by being a felon in possession of an unregistered shotgun having a barrel of less than eighteen (18) inches in length.

On December 4, 2014, the Court held an evidentiary hearing concerning Defendant's Motion to Suppress. Officer Tim Goodman, Detective Sergeant Tim Edwards, and Captain William Hamby testified at the hearing.

The Court finds that the Government's witnesses were credible.

On July 15, 2013, the United States Marshals Service, the United States Probation Office, the Iredell County Sheriff's Office, and the North Carolina Probation Office engaged in a joint operation for sex offender compliance checks in Iredell County. (Hr'g Tr. 5, 44-45, Dec. 4, 2014). Officers from the respective organizations split into several teams, each checking between eight to ten residences. (Hr'g Tr. 44-45). The purpose of the joint operation was to increase efficiency by allowing each organization to perform checks on individuals within their jurisdiction. (Hr'g Tr. 61). If the individual was under federal supervision, then the federal probation officer would take the lead role. (Hr'g Tr. 7). If the individual was under state supervision, then the North Carolina Probation officer would take the lead role. (Hr'g Tr. 66). If the sex offender was not under any form of probation, then the Iredell County Sheriff's Office would have the lead role in conducting the check. (*Id.*). Officers who did not take a lead role in the investigation provided assistance in a supporting role. (Hr'g Tr. 21).

One of the teams stopped at Defendant's home in the late afternoon. (Hr'g Tr. 18, 44). Defendant was not on federal supervised release or any form of probation. (Hr'g Tr. 8, 66). Therefore, the Iredell County Sheriff's Office was the lead agency in this compliance check. (Hr'g Tr. 66). Detective Sergeant Tim Edwards of the Iredell County Sheriff's Office was the lead officer. He was assisted by John Hill of the North Carolina Probation Office, Tim Goodman of the Federal Probation Office, and Deputy Officer Thomas Patrick of the United States Marshals Service. (Hr'g Tr. 6). Edwards had on his uniform and Patrick had a vest indicating that he was a Marshal. (Hr'g Tr. 6-7). All officers were armed and wore protective vests. (Hr'g Tr. 8, 25-26). No officer removed his service weapon from its holster or intentionally displayed it throughout their encounter with Defendant. (Hr'g Tr. 59).

This was not the first time Edwards encountered Defendant. He was present when Defendant was arrested in 2010 and has conducted some three or four sex offender compliance checks at his home since Defendant's release on January 3, 2012. (Hr'g Tr. 72-74). Defendant was typically cordial and friendly when he encountered Edwards. (Hr'g Tr. 43). Edwards never entered Defendant's residence prior to July 15, 2013. (Hr'g Tr. 90).

Edwards also has experience with joint operations. (Hr'g Tr. 63). He testified that the purpose of a compliance check is to ensure that the registrant actually lives at the residence at which he or she registered. (Hr'g Tr. 45, 69). The first sign of compliance is actual presence at the residence. (Hr'g Tr. 46). However, other evidence of actually residing in a location is the presence of personal effects needed for daily livelihood. (Hr'g Tr. 69-70). Edwards performs what he describes as a "walkthrough" to find these personal effects. (Hr'g Tr. 76). Normally, Edwards asks for permission to enter the residence to perform a walkthrough. (Hr'g Tr. 46). Not everyone allows him into the home. (Hr'g Tr. 47). When the team is refused entry it leaves unless the offender is also on probation.[1] (*Id.*).

On the day in question, the four officers arrived in two unmarked cars. (Hr'g Tr. 24, 93). The cars were parked in the only driveway to Defendant's home. (Hr'g Tr. 89). The officers got out of their vehicles and approached Defendant's residence. (Hr'g Tr. 8). There were two or three individuals already present on the front porch. (Hr'g Tr. 8, 28, 47). Edwards spoke to the individuals with Goodman behind him. (Hr'g Tr. 8, 28). The other officers were spread out for safety purposes. (Hr'g Tr. 9).

Then the Defendant came out onto the porch. (Hr'g Tr. 11, 95). Edwards engaged the Defendant and informed him that the officers were performing a compliance check and asked for permission to enter the home. (Hr'g Tr. 9, 11-12, 29). In his testimony, Edwards did not

---

[1] A common condition of supervised release is consent to warrantless searches. (Hr'g Tr. 31).

remember receiving explicit consent to enter the home. (Hr'g Tr. 47). However, he did testify that he would not have entered the home without permission to do so. (Hr'g Tr. 47, 86). Defense counsel confused Edwards at one point (Hr'g Tr. 70-72), but Edwards testified that he would not have entered the home without permission because he knows he does not have the lawful authority do so. (Hr'g Tr. 99). Goodman did remember Defendant giving permission to enter. Goodman stated that Edwards first informed the Defendant that the team was performing a compliance check. (Hr'g Tr. 12). Edwards said, "You don't mind if we look around, do you?" (Hr'g Tr. 9) or "Do you mind if we look around?" (Hr'g Tr. 29). The inflection in Edwards's voice made clear that he was asking a question and not making an order. (Hr'g Tr. 29). Defendant responded "Yeah, sure, fine." (Hr'g Tr. 9, 11). He appeared calm and was not confused by the question. (Hr'g Tr. 11). Neither he nor any of the people on the porch seemed surprised or concerned that the officers were going to enter the residence. (Hr'g Tr. 12-13). None of the officers threatened or appeared to threaten anyone. (Hr'g Tr. 14). No officer told Defendant that the sex offender statutes did not subject him to searches of his home. (Hr'g Tr. 29-30). However, Defendant had some notice of what North Carolina requires of a sex offender because he signed and initialed every page of a thirteen page acknowledgement form. Ex. 1. No officer told him that he could refuse consent. (Hr'g Tr. 30). Edwards did not require Defendant to sign a consent to search waiver form issued by the Iredell County Sheriff's Office. (Hr'g Tr. 80). However, there is no set policy requiring use of such form and he was not investigating a criminal matter. (Hr'g Tr. 49, 80). Nor did Edwards expect to find evidence of criminal activity. (Hr'g Tr. 98). Had Edwards been responding to a criminal complaint or executing a search warrant he would have been more likely to use a waiver. (*Id.*). Therefore, the fact that a consent

waiver was not used does change the fact (or this Court's finding) that permission was actually granted.

After obtaining permission to enter, Goodman and Edwards walked through the doorway and into the living room. (Hr'g Tr. 12, 53). Hill and Patrick remained outside the residence with the individuals and the Defendant on the porch. (Hr'g Tr. 14-15). All of the individuals, including Defendant, remained cooperative. (Hr'g Tr. 37-38). None of them was restrained in any manner. (Hr'g Tr. 13, 51-52). Officers always have a concern for safety when performing a search; however, in this instance that the concern was not elevated. (Hr'g Tr. 33-35, 37-38, 40, 91). No individual, including Defendant, was given specific directions on where to stand or sit. (Hr'g Tr. 13, 40, 51). Defendant's party remained within view of Hill and Patrick. (Hr'g Tr. 40-41, 92).

Goodman walked through the living room and into a bedroom. (Hr'g Tr. 15). He immediately noticed a shotgun lying against the wall to the left of the bedroom's door. (*Id.*). He pointed it out to Edwards. (*Id.*). Edwards picked up the shotgun because he realized it was unlawful for a convicted felon to possess a firearm. (Hr'g Tr. 54). He then left the home and walked to Hill's sports utility vehicle. (*Id.*). Upon Edwards's exit of the home, Moore was on the front porch or in the front yard. (Hr'g Tr. 55-56). Edwards asked him if he would come over to speak to him and the Defendant understood that he was referring to the shotgun. (Hr'g Tr. 56). Defendant willingly walked over to the vehicle and spoke to Edwards about the shotgun in the driveway near the rear of the vehicle. (Hr'g Tr. 56-57). Hill was also present. (*Id.*). The other officers were at the end of the driveway near the road. (Hr'g Tr. 96-97). Edwards asked Defendant where the gun came from, what he knew about it, and whether he had handled it. (Hr'g Tr. 57). He did not read Defendant his *Miranda* rights because he was not under arrest and

5

he believed he was not in custody at that point. (*Id.*) The Defendant then indicated that the shotgun was his and he had touched it six months ago. (Hr'g Tr. 57-58). During this conversation, Moore remained cordial, friendly, and relaxed. (Hr'g Tr. 59). Edwards wrote out a statement for the Defendant describing the conversation and the Defendant affirmed it by initialing it. (Hr'g Tr. 77). The Defendant was not arrested after the conversation. (Hr'g Tr. 60).

Edwards wrote an incident report after the compliance check was completed. (Hr'g Tr. 82-83). Edwards indicated that officers were performing a compliance check walk-through of Defendant's home. (*Id.*). He did not explicitly mention that Moore gave permission to search. (*Id.*). However, Edwards understood that permission was required. This, taken in conjunction with Goodman's testimony, establishes that permission from the Defendant was obtained to enter the home.

Defense counsel called William Hamby, who was a lieutenant in the Special Victims Unit at the Iredell County Sherriff's Office on the date in question. (Hr'g Tr. 104-05). He assisted organizing the check on July 15, 2013 and a check on July 16, 2013. (Hr'g Tr. 105). He was interviewed by Donna Swicegood. (Hr'g Tr. 106). Donna Swicegood wrote a newspaper article which indicated that Hamby told her that the teams targeted sex offenders on probation on July 15, 2013. (Hr'g Tr. 107). She stated that the teams targeted those who were not on probation on July 16. (*Id.*). Hamby never told her that. (Hr'g Tr. 108, 110). The teams did not specifically target sex offenders on probation one day and then target sex offenders not on probation the next day. (*Id.*). Instead, they went to homes that were geographically close to each other. (Hr'g Tr. 68, 108).

## II. ANALYSIS

Defendant contends that consent was never properly obtained and the statements regarding the shotgun were taken in violation of *Miranda*. The Government disagrees. No party claims that a warrant was used to enter the home.

### A. Valid Consent to Search was Obtained

The Fourth Amendment protects against unreasonable searches and seizures. U.S. Const. amend. IV. A warrantless search of a home is reasonable if conducted with valid consent of a resident. *Heien v. North Carolina*, No. 13-604, 2014 WL 7010684, at *5 (U.S. Dec. 15, 2014); *Trulock v. Freeh*, 275 F.3d 391, 401 (4th Cir. 2001). "Consent to search is valid if it is (1) knowing and voluntary and (2) given by one with authority to consent." *United States v. Digiovanni*, 650 F.3d 498, 513 (4th Cir. 2011), *as amended* (Aug. 2, 2011). It is clear that Defendant had authority to consent as a resident of the home. The Government must prove by a preponderance of the evidence that it obtained valid consent to search. *Id.*

The consent assessment is made by viewing the totality of the circumstances present when the consent was given. *Id.* One such factor is the characteristics of the accused, such as his education, intelligence, maturity, age, and experience. *Id.*; *United States v. Boone*, 245 F.3d 352, 362 (4th Cir. 2001). Also relevant is the number of officers present, their conduct, and the duration of the encounter. *Boone*, 245 F.3d at 362. "Consent given while in custody may still be voluntary." *Id.* "Whether the accused knew he possessed a right to refuse consent is a relevant factor, but the government need not demonstrate that the defendant knew of his right to refuse consent to prove that consent was voluntary." *Id.* Consent is not valid if it is obtained through acquiescence to a wrongful claim of legal authority. *Bumper v. North Carolina*, 391 U.S. 543, 548-49 (U.S. 1968); *Trulock*, 275 F.3d at 402.

7

In this case, the Defendant is a middle-aged man with experience with police officers based on his criminal record. *Boone*, 245 F.3d at 362 (felon's experiences with police weighed in favor of voluntary consent). Further, he had met the lead officer, Edwards, on several occasions. There were four officers present; however, there were three or four individuals, including Defendant, present at the home when they arrived. The fact that there may have been an equal number of officers and individuals favors of a finding of consent because Defendant was not outnumbered. One officer was in uniform and another wore a vest indicating that he was a Marshal. All were armed and wore protective vests. The team arrived in two unmarked cars and engaged the people on the porch in conversation. No officer brandished or intentionally displayed their weapon. The officers did not intimidate the Defendant or anyone present on the porch. There was no heated exchange. The Defendant voluntarily came out of his home and was approached by Edwards who informed him that they were performing a sex offender compliance check. Edwards then asked him in the form of question whether he minded them looking around. Defendant responded "Yeah, sure, fine." *United States v. Wilson*, 895 F.2d 168, 172 (4th Cir. 1990) (fact that officer did not threaten individual, display weapon, and asked for consent in public place weighs in favor of finding voluntary consent). The fact that Defendant was not told of his right to refuse consent or that his sex offender status does not require him to consent does not make his consent involuntary. The officers in question were not overbearing and there was no hint of coercion. The persons present, including the individuals on the porch, the officers, and Defendant, were calm, respectful, and cordial.

Nor did the Defendant acquiescence to a wrongful claim of legal authority. The *Bumper* case is a prime example of acquiescence to a wrongful claim of legal authority. The officer in that case announced to the occupant of the home that he had a search warrant and she let him in.

8

*Bumper*, 391 U.S. at 549. The government decided not to rely on the warrant to get the incriminating material found into evidence. *Id.* The Supreme Court held that there could be no consent in such a situation rife with coercion. *Id.* at 550. The Court stated that "[w]hen a law enforcement officer claims authority to search a home under a warrant, he announces in effect that the occupant has no right to resist the search." *Id.* Another example of acquiescence to a claim of wrongful legal authority would be a situation where a police officer wrongfully asserts that he has authority to call a drug dog and then receives permission to search a stopped vehicle. *See United States v. Lattimore*, 87 F.3d 647, 652 (4th Cir. 1996) (such an assertion "would raise serious questions concerning the voluntariness" of a persons consent.). A more recent example would be where a police officer falsely asserts that he has probable cause to search a vehicle when he in fact does not have it. *See United States v. Saafir*, 754 F.3d 262, 265-66 (4th Cir. 2014) (per curiam).

The police officers in the instant case did not engage in deception or coercion in order to receive consent to search the home. They did not tell the Defendant that they had the authority to search his home. They merely asked for his permission in a non-coercive setting and received it. Therefore, the consent was valid. Nor did the officers rely on the North Carolina sex offender registration statute. They understood that they did not have the authority to enter into Defendant's home merely because he was a sex offender. The Iredell County Sheriff's Office is allowed, pursuant to N.C. Gen. Stat. § 14-208.9A(b), to verify that Defendant resided at the residence to which he last registered. This registration program "assist[s] law enforcement agencies and the public in knowing the whereabouts of sex offenders and in locating them when necessary." *In re Borden*, 718 S.E.2d 683, 685-86 (N.C. Ct. App. 2011). The presence of household and personal effects would assist in determining if it was an offender's actual

9

residence; however, the officers knew they could not get this evidence without obtaining valid consent.

Defendant cites to the case of *United States v. Arwood* as support for his assertion that he did not validly give consent because he acquiesced to wrongful claim of legal authority. However, the facts are easily distinguishable. In *Arwood*, the police approached the residence of the defendant, a convicted sex offender, for purposes of address verification. *United States v. Arwood*, No. 2:10-CR-24, 2010 WL 2103031, at *2 (E.D. Tenn. Apr. 27, 2010) *rep. and recomm. adopted,* No. 2:10-CR-24, 2010 WL 2103004 (E.D. Tenn. May 21, 2010). They asked the defendant if he had any firearms and he responded affirmatively. 2010 WL 2103031, at *3.[2] The defendant said he would retrieve the gun and the officers asked to accompany him, which he allowed. *Id.* at *3. The defendant won his motion to suppress by proving that his consent was not voluntary. The government argued that the defendant's erroneous belief that he had to answer the officers questions was no defense and he validly gave consent to enter the home. *Id.* at *3-*4. The Court found that defendant's misapprehension of his rights was traceable to prior conduct of the Sheriff's Department. *Id.* The Sheriff's Department had performed walk-throughs in the defendant's home on three prior occasions. *Id.* at *1-*2. On the first occasion, the officer made clear to the defendant that he was required to let the officers enter into his premises because he was a sex offender. *Id.* at *1. All of the subsequent times the defendant gave "consent" to enter his home were based on the first wrongful claim of legal authority. *Id.* at *4.

In this case, there were prior visits by the Sheriff's Office to Defendant's home. However, no officer ever told Defendant that he had to let him into his home because he was a

---

[2] The Sheriff's Department had been tipped off about Defendant's possession of the firearm by a disgruntled neighbor. 2010 WL 2103031, at *2.

sex offender. In fact, no officer had ever entered Defendant's home prior to July 15. Accordingly, Defendant was not laboring under a misapprehension created by the Government. Therefore, his consent was voluntary and the shotgun will not be suppressed.

      B.  The Defendant was not in Custody for Purposes of *Miranda*

  The Defendant next argues that his inculpatory statements regarding the shotgun should be suppressed because he did not receive *Miranda* warnings before making them. The Government concedes that the *Miranda* warnings were not administered and the questions regarding the shotgun amounted to an interrogation. However, the Government maintains that Defendant was not in custody when making the statements.

  The Fifth Amendment provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. This constitutional protection is safeguarded by the *Miranda* doctrine. *See Miranda v. Arizona*, 383 U.S. 436, 444 (1966). *Miranda* warnings are generally required prior to custodial interrogations. *United States v. Hashime*, 734 F.3d 278, 282 (4th Cir. 2013). The issue in the present case is whether the Defendant was in custody.

  In this case, the Defendant was not formally arrested. Therefore, the custody issue is determined by considering whether, under the totality of the circumstances, a "suspects freedom of action [was] curtailed to a degree associated with formal arrest." *Id.* (quoting *United States v. Parker*, 262 F.3d 415, 419 (4th Cir. 2001)). The inquiry is totally objective and focuses on whether "a reasonable man in the suspect's position would have understood his situation to be one of custody." *Id.* (quoting *United States v. Colonna*, 511 F.3d 431, 435 (4th Cir. 2007)) (internal quotations omitted). Therefore, "the court considers whether 'a reasonable person would have felt he or she was not at liberty to terminate the interrogation and leave.'" *Id.* at 282-

83 (quoting *United States v. Jamison*, 509 F.3d 623, 628 (4th Cir. 2007)) (internal brackets omitted). When "the totality of the circumstances demonstrate[] that the '*coercive pressures* that can be brought to bear upon a suspect in the context of a custodial interrogation'" are not present, a court will find that *Miranda* warnings are not necessary. *United States v. Colonna*, 511 F.3d 431, 436 (4th Cir. 2007).

A court considers factors such as "the time, place and purpose of the encounter, the words used by the officer, the officer's tone of voice and general demeanor, the presence of multiple officers, the potential display of a weapon by an officer, and whether there was any physical contact between the officer and the defendant." *Id.* at 283 (quoting *United States v. Day*, 591 F.3d 679, 696 (4th Cir. 2010)). Other pertinent factors include physical restrictions, isolation, and separation from family. *Id.*

In this case, there were two officers present during the interrogation. Two other others were present at the street at the end of the driveway. Several individuals associated with the Defendant were a short distance away at the porch.

The officers also did not act in a manner such as to intimidate or threaten the Defendant or his family. They did not intentionally display or remove their weapons. The encounter began and ended in a cordial manner. An objective person would not have felt threatened by their presence. Moreover, "[t]he mere presence of armed law enforcement officers . . . is not sufficient to create a custodial situation." *United States v. Hargrove*, 625 F.3d 170, 179 (4th Cir. 2010).

Edwards asked the Defendant to come to the vehicle to talk. He did not order him to do so. There was no physical contact between any officer and the Defendant. Further, the Defendant was not put in restraints. The entire interaction was brief. The officers did not act in

a way so as to break the Defendant's will or to force him to say or sign anything about the shotgun. Further, the officers allowed Defendant to leave after the questioning. *Howes v. Fields*, 132 S. Ct. 1181, 1190 (2012) (citing *California v. Beheler*, 463 U.S. 1121, 1122 (1983) (per curiam)).

The Fourth Circuit, in an unpublished opinion, indicated that a court should consider "the extent to which [a defendant] is confronted with evidence of his guilt." *United States v. Jones*, 367 Fed. App'x 482, 485 (4th Cir. 2010). However, this is a single factor and is not conclusive. For example, the Fourth Circuit has found that a defendant was in a non-custodial setting in a police station when confronted with video evidence of his guilt. In *United States v. Uzenski*, 434 F.3d 690 (4th Cir. 2006), the North Carolina State Bureau of Investigation ("SBI") was investigating the manufacture of two pipe bombs. The defendant served as a detective and had called in reporting a pipe bomb. *Id.* at 694. Another was found in the immediate vicinity. *Id.* Originally, the detective was not under investigation, but the police found video evidence of him purchasing bomb-making materials. *Id.* at 695. They asked him to come to the office to "assist" with the investigation and sat him in a room and made him watch the video. *Id.* at 696-97. After the video finished playing, an officer told him "[w]e know who, we know what, we know where, and we know when. The only thing we don't know and want to know is why." *Id.* at 696. The police told him he was not under arrest at that time. *Id.* at 697. Defendant moved to suppress the statements he made after the video was played. *Id.* at 704.[3] The Fourth Circuit denied the motion to suppress, emphasizing that he voluntarily came to the meeting at the police station, he was told he was not under arrest, and that he was not unduly restricted in his freedom of action. *Id.* at 705. Here, the Defendant was in the presence of the shotgun during the questioning and

---

[3] The Defendant later received *Miranda* warnings but his subsequent statements were not the subject of the motion. *Uzenski*, 434 F.3d at 690.

when signing the statement. However, he voluntarily came over to the vehicle knowing that he would be questioned regarding it. The officers did not tell the Defendant that he could refuse to answer the questions or that he was free to leave. *See Hashime*, 734 F.3d at 284 (informing a Defendant weighs against a finding of custody). However, other factors, such as the home setting of the interrogation and the fact that the Defendant was not unduly restricted, support a finding that the Defendant was not in custody.

The interview took place in Defendant's driveway. Interviews taking place on a person's property "tend[] to be more neutral than one that occurs at a law enforcement facility" and are less likely to be custodial in nature. *United States v. Hargrove*, 625 F.3d 170, 180 (4th Cir. 2010). However, this neutral environment is no longer present when it is dominated by a large police presence that creates the reasonable belief that a suspect has lost control of his home until they have finished searching. *Hashime*, 734 F.3d at 784-85; *Colonna*, 511 F.3d at 433-36. This case is easily distinguishable from *Hashime* and *Colonna*. In *Hashime*, the home was completely occupied by some twenty-one agents who stormed in with guns drawn. 734 F.3d at 780. The officers awoke the then-naked defendant. *Id.* They separated him from his family and interrogated him for three hours in an unfinished storage room in his basement. *Id.* His family members were told they could not see him. *Id.* In *Colonna*, twenty four officers executed a search warrant at 6:29 a.m. 511 F.3d at 433. They kicked open the defendant's door and awoke him at gunpoint. *Id.* Later, they slammed him into a door. *Id.* The defendant was interrogated for three hours in a police vehicle sitting between two officers. *Id.* at 436. Here, the Defendant did not encounter a swarm of officers. He voluntarily came out and greeted them. The search had all but concluded when they asked him to speak and he willingly walked down to the vehicle. He was not isolated from those present on the porch. While officer safety is always a

14

concern, there is evidence suggesting that he entered the home at one point (Hr'g Tr. 52-53) and no one, including the Defendant, was restrained or told where to be. The interview was short. No police officer acted in a coercive manner such that a reasonable person would feel as if he or she had lost control of the home. Therefore, the Defendant was questioned in the neutral home environment.

The totality of the circumstances shows that Defendant was not in custody for purposes of *Miranda*. Defendant was not isolated or restrained in any manner. No officers acted in such a way as to intimidate the Defendant or anyone present. All present were friendly and cordial to each other. The questioning was short. Defendant was in the neutral environment of his own property. Therefore, the Defendant's statements regarding the shotgun will not be suppressed.

**IT IS, THEREFORE, ORDERED THAT** Defendant's Motion to Suppress Tangible Evidence and Statements (Doc. 12) be **DENIED.**

Signed: January 7, 2015

Richard L. Voorhees
United States District Judge